[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by the plaintiff from the assessment of damages in the amount of $160,000 paid by the defendant for the taking by eminent domain on October 5, 1989, of her property at 755 North Main Street, consisting of land and buildings thereon, in the Town of Manchester. This was a total taking for the layout, alteration, extension, widening, change of grade and improvement of the highway known as North Main Street.
Said premises are more particularly bounded and described as follows:
SOUTHERLY — by North Main Street, 373 feet, more or less;
WESTERLY — by land now or formerly of the Town of Manchester (Park Driveway), 79 feet, more or less;
NORTHWESTERLY — by Tolland Turnpike, 349 feet, more or less; and
EASTERLY — by lands now or formerly of Brook T. Newkirk and of Anthony Dzen et al., partly by each, in all, 255.71 feet.
Said parcel contains 1.36 acres, more or less, together with all buildings and appurtenances, all of which more particularly appears on a map entitled: "Town of Manchester, Map Showing Land Acquired From Minnie Blanche Webb by The State of Connecticut, Intersectional Improvement North Main St., Scale 1" = 40', February 1989, Robert W. Gubala, Transportation Chief Engineer — Bureau of Highways."
North Main Street, which bounds the subject property on the south, is the dividing line in that area of the town between recently-developed commercial uses on the south side and established residential dwellings on the north. The parties are in agreement that the highest and best use of the subject premises is for expanded residential use.
The plaintiff's property is shaped almost like an isosceles triangle, the two street frontages being almost equal in length. The odd configuration of land will be important in the later discussion of a possible subdivision of the land. The zone is Residence A, which requires a lot area of 1200 square feet and a street frontage of 100 feet. The setback lines are: 25 feet front yard; 30 feet rear yard; and 10 feet side yards. These zoning requirements are also relevant in the consideration of any possible subdivision of the land.
The plaintiff's property is unique. It is a colonial homestead registered with the Manchester Historical Society. The plaintiff, who is 91 years of age, resided there for 68 years until she was forced to move in April of 1990 because of the defendant's condemnation of her property. A homestead such as this, however, unless of historical significance, which this is not, is out of context in today's land development in urban and CT Page 1979 suburban areas, such as the Town of Manchester. It is a financial luxury that can be continued only for a family's traditional values, and perhaps, hopeful appreciation in value for a later generation. This is especially true in this neighborhood of relatively small homes and smaller lots in proximity across the street from extensive commercial development of former farm land. The property at the time of taking was ripe for residential development. This is agreed to by the appraisers for both parties.
The improvements on the property consist of a Cape-style frame dwelling and garage. The house was built in 1790. Its colonial authenticity, however, was compromised by a one-store wing added on the east side at a later date. There are four rooms on the first level, two on the upper floor, and a partial basement. It is improved with a full bath, kitchen facilities, 220 volt wiring for an electric range, and a hot water heating system on the lower level. Typical of a colonial home, the rooms are small, with a total living area of 1438 square feet. The original structure is 690 square feet in ground area and the addition is 324 square feet. There is public water and a septic sanitary sewer system servicing the home. The house is marketable, but minimally habitable without extensive improvements for full conformity to the town health and building codes. A total denial of maintenance and redecoration of the home for many years is apparent in its evident neglect. Of significance in this proceeding is the conclusion that the home could not be preserved by removal to another site.
A 20 feet by 24 feet detached one-stall garage is located about 80 feet to the east of the dwelling and is connected to Tolland Turnpike by a dirt driveway. This was built about 55 years ago on stone piers and has fallen into a markedly deteriorated condition. It is presently unusable and unsafe because the dirt floor has eroded to a great extent where the rear of the structure is above the surrounding grade.
The garage has not been valued independently of the dwelling and land. In its present condition it has only minimal value appurtenant to the home. If repaired, it could only have value for use by occupants of the property. On the other hand, its repair and further use in its present location would be an impediment to the highest and best use of the vacant land surrounding it for residential development. For that reason, it would not be costwise to make the necessary extensive improvements. Even if the garage were movable to another site, which has not been proven feasible because of the nature of its construction, the court concludes that (1) the expense of such relocation would challenge the move, and (2) its relocation might hinder the best development of the land available after separating the home lot.
Both appraisers used the market comparison approach in evaluating the plaintiff's damages. They also agreed that the land was subdividable. Beyond this unanimity, they differed in the identity of comparable sales, the number of lots available through subdivision of the excess land, and the ultimate damages resulting from their analyses.
The plaintiff's appraiser allocated 0.28% of an acre of land, the CT Page 1980 minimum of 12,000 square feet required by the zoning regulations, to the dwelling and garage. Based on his comparable sales of single-family residences, he valued the house, garage and home lot at $120,000. Using comparable sales of developed land, he valued the remaining undeveloped 47,242 square feet of land at $3.00 per square foot for a total land value of $141,726. His total property valuation was rounded to $262,000.
Supplementing his valuation, the plaintiff's appraiser sketched a rough plot plan showing a subdivision of four lots, three other than the house lot he valued with the dwelling and garage. In support of this appraisal, a registered architect and land planning consultant offered three alternative four lot subdivisions meeting the zoning requirements.
Based on the analysis of his comparable sales of single-family homes, the defendant's appraiser valued the house, garage and 1.0 acre of surrounding land at $125,000. Using comparable sales of building lots, he found the additional building lot on the subject property containing 0.35 of an acre to be worth $35,000. Total damages in his estimation were, therefore, $160,000, the amount paid to the plaintiff on the taking.
Before a proper analysis of the subdividability of the subject premises may be made, the following facts must of necessity be considered in addition to the zoning regulations: (1) the house fronts on North Main Street about 90 feet from the street line on the western or narrow end of the land; (2) the western side of the house is about 90 feet from the street line of Park Driveway; (3) the rear of the house is located about 8 feet south of Tolland Turnpike; (4) the septic tank is located about 25 to 30 feet easterly of the house; (5) the garage fronts on Tolland Turnpike in the eastern or wider portion of the land; (6) it is about 35 feet from Tolland Turnpike, 110 feet from the eastern property line, 130 feet from North Main Street and 80 feet from the house; (7) public water is available on North Main Street; (8) there is no evidence that public water is available on Tolland Turnpike alongside the plaintiff's property; (9) sewer mains were installed on North Main Street after the taking; (10) there are no sewers available on Tolland Turnpike; and (11) the grade rises from North Main Street to an elevation of about 10 feet on Tolland Turnpike.
"`[C]ourts have uniformly adopted the approach that raw land as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision . . . . The accepted rule for the evaluation of such land, therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment of enhancement in value due to the property's present adaptability to subdivision development.' (Emphasis added.) 4. P. Nichols, Eminent Domain (3d Ed.) section 12.3142 [1] [a], pp. 12-335-356. In determining it highest and best use of trial referee must consider whither there was a reasonable probability that in the reasonable near future the subject property will be subdivided. Budney v. Ives, 156 Conn. 83,239 A.2d 482 (1968). The trial referee must make this determination not only from the testimony and physical evidence presented, but also from his or her own CT Page 1981 personal observation of the property. See General Statutes Section 13a-76." Minicucci v. Commissioner of Transportation, 211 Conn. 382, 385 (1989).
Based upon all of the testimony and physical evidence presented in this proceeding, and upon the court's personal observations on a viewing of the property and perambulation of its boundaries, the court finds that at the time of the taking there was a reasonable probability that in the reasonably near future the subject property would be subdivided. The parties agree on this conclusion, but differ in the extent of such subdivision.
The court finds that the plaintiff's proposed subdivision into four lots would be an unacceptable subdivision because of its jigsaw approach to cut up of the land. It is a contortion of the land to impress four lots upon it for maximization of number, but not for feasibility, practicality, marketability or reasonable expectation of acceptability by the appropriate zoning authorities.
The defendant's proposal is also somewhat deficient. It is excessive in its allocation of 1.0 acre of land to the house lot, retaining 0.35 of an acre for only a single extra building lot. A reasonably acceptable subdivision would allow for more.
Based upon all relevant factors, and the court's knowledge and experience in the law relating to land subdivision and zoning requirements, the court finds that a reasonable acceptable subdivision was reasonably foreseeable at the time of taking in the following manner: (1) the house and home lot containing 0.66 of an acre would be created at the western or shallow end of the property, the easterly line of this lot running from North Main Street to Tolland Turnpike and parallel to the easterly boundary of the subject property, (2) two residential building lots would be carved from the remaining land, each containing 0.35 of an acre and extending from North Main Street to Tolland Turnpike, the two interior property lines being parallel to the easterly boundary line of the new home lot as well as to the easterly boundary of the subject premises. In this subdivision plan or layout, all three lots would conform to the zoning regulations and be serviced by public water and sewer mains.
A state referee sitting as a court in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses and claims of the parties. He is charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v. Commissioner of Transportation, supra, 388; Birnbaum v. Ives,163 Conn. 12, 21-22 (1972); Feigenbaum v. Waterbury, 20 Conn. App. 148, 153
(1989). It is his task to reach a result that gives the plaintiff, as nearly as possible, a fair equivalent in money as just compensation for the land and building taken. Mathis v. Redevelopment Agency, 165 Conn. 622, 623
(1973); Feigenbaum v. Waterbury, supra, 153-54. CT Page 1982
Based upon a full consideration of the evidence offered by the parties, a careful viewing and perambulation of the subject premises and its surrounding area, and a review of the comparable sales upon which the appraisers relied, as well as of relevant factors, such as the highest and best use of the property, its size, shape, topography, zoning classification, location and proximity to large commercial developments, and my own knowledge of the elements constituting value, I find that the value of the plaintiff's property taken by the defendant is as follows
 House and home lot containing 0.66 of an acre $125,000 First extra building lot containing 0.35 of an acre 40,000 Second extra building lot containing 0.35 of an acre 40,000 Total damages $205,000
Judgment may enter for the plaintiff in the amount of $205,000 less $160,000 already paid, or an excess of $45,000, with interest on such excess from the date of taking to the date of payment, together with costs, and a reasonable appraisal fee of $700.
WILLIAM C. BIELUCH, State Trial Referee